# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **8:16CV233** |
| vs. | |
| STABL INC., LANT, INC., LEON JOHNSON, and ANN JOHNSON, | **AMENDED ORDER** |
| Defendants. | |
| STATE OF NEBRASKA, | |
| Plaintiff, | **8:16CV351** |
| vs. | |
| STABL, INC., LANT, INC., LEON JOHNSON, and ANN JOHNSON, | **AMENDED ORDER** |
| Defendants. | |

This matter is before the Court on Defendants' motion to quash the prejudgment writ of garnishment issued *ex parte* by this Court for Defendants' investment account at Waddell & Reed. (Filing No. 154 in the Lead Case).[1] A hearing on the motion pursuant to 28 U.S.C. § 3101(d)(2) was held before the undersigned magistrate judge on September 6, 2018.[2] In addition to the briefs and evidence submitted prior to the hearing, (Filing Nos. 155, 156, 159, 161, 162), the parties also submitted post-hearing briefs and evidence, (Filing Nos. 172, 177, 180, 181). A transcript (TR.) of the hearing was prepared and filed on September 16, 2018. (Filing No. 170). After careful consideration of the parties' arguments and evidence, the Court will grant

---

[1] Unless otherwise indicated, citations to the court record will be to the Lead Case, 8:16CV233.

[2] At the outset of the hearing, Defendants objected that the undersigned magistrate judge does not have jurisdiction to preside over the proceedings because they are injunctive in nature, which objection was overruled. Pursuant to 28 U.S.C. § 636(b)(1)(A), a magistrate judge may not determine a motion for "injunctive relief." However, a prejudgment remedy of garnishment is not "injunctive relief." See, e.g., *United States ex rel. Lutz v. United States*, 853 F.3d 131, 136 (4th Cir. 2017)(concluding prejudgment writs of attachment and garnishment were not injunctive in nature; *Aetna Life Ins. Co. v. Tooth Savers Dental Servs.*, No. 3:96 CV 570(GLG), 1997 WL 102453, at *1 (D. Conn. Feb. 4, 1997)(finding that prejudgment garnishment of a bank account is not injunctive relief).

Defendants' motion to quash because the undersigned concludes that there are adequate remedies alternative to prejudgment garnishment that will protect the United States' interests.

## PROCEDURAL BACKGROUND

As recounted by the Court in several previous orders, the United States and the State of Nebraska filed these actions to recover their respective portions of a judgment awarded against Stabl Inc. ("Stabl") in a prior action as civil penalties for violations of the Clean Water Act ("CWA") and Nebraska Environmental Protection Act ("NEPA"). See *United States of America et al. v. Stabl, Inc. f/k/a Nebraska By-Products, Inc.*, Case No. 8:11CV274. The United States and the State filed that action against Stabl on August 10, 2011, for violations of the CWA and NEPA, and, following a bench trial, on January 31, 2014, the Court entered a judgment against Stabl "in the amount of $2,285,874, payable to the Plaintiffs and to be divided equally between them," which judgment was affirmed by an Eight Circuit mandate issued October 21, 2015. (Filing Nos. 157 and 175 in Case No. 8:11CV274). Stabl has paid nothing towards the judgment.

The United States and State allege that, beginning in August 2006, defendant Leon Johnson, the owner of Stabl, was notified by the Nebraska Department of Environmental Quality ("NDEQ") that Stabl was not in compliance with the CWA and NEPA. Between 2006 and 2010, the NDEQ and Environmental Protection Agency ("EPA") took steps to enforce Stabl's compliance with the CWA and informed Johnson of penalties for noncompliance. In July 2010, Stabl was notified by the United States Department of Justice of a potential civil enforcement action pursuant to the CWA, including monetary penalties owed by Stabl in the amount of $2,883,414. (Filing No. 131-2 at p. 28). The United States alleges that, five days later, on July 13, 2010, Stabl transferred almost of all of its assets, approximately $8 million, to defendants Leon and Ann Johnson, via three wire transfers. (Filing No. 47).

On May 26, 2016, the United States filed this action against Stabl, its holding company, Lant, Inc., and the Johnsons individually, alleging that the July 2010 wire transfers were fraudulent under the Federal Debt Collection Practices Act ("FDCPA").[3] The United States later added one claim entitled "Piercing Stabl's Corporate Veil" in its Amended Complaint. The State

---

[3] 28 U.S.C. §§ 3001-3308

filed this action on July 15, 2016, asserting one claim for fraudulent transfers under the Nebraska Uniform Fraudulent Transfer Act ("NUFTA").[4]

Following discovery in these cases, on June 21, 2018, the United States filed an Ex Parte Application for Prejudgment Writ of Garnishment pursuant to 28 U.S.C. §§ 3101 and 3104, seeking to garnish funds owned by defendants Leon and Ann Johnson to satisfy the 2014 judgment. (Filing No. 129). The United States provided the Affidavit of Joan K. Meyer and Daniel Leistra-Jones in support of its ex parte application. (Filing No. 131-1). Upon review of the United States' Ex Parte Brief (Filing No. 130), Ex Parte Index of Evidentiary Material (Filing No. 131), and Ex Parte Supplementary Index of Evidentiary Material (Filing No. 135), the Court found that the application had merit and entered an Order (Filing No. 136) granting the United States' motion and directing the Clerk of Court to issue the prejudgment writs of garnishment (Filing No. 129-1) as requested by the Unites States.

On July 9, 2018, the prejudgment writs of garnishment were issued to the Johnsons' accounts at Edward Jones (Filing No. 137) and Waddell & Reed (Filing No. 138). The funds in Johnsons' two brokerage accounts with Edward Jones, one containing an estimated total market account value of $92,470.49, and the other containing an estimated total market account value of $1,046,880.30, were garnished. (Filing No. 140). Waddell & Reed froze the assets in the Johnson's investment account with a net asset value of $3,395,924.70. (Filing No. 141).

Defendants received notice of the above filings and prejudgment writs on July 18, 2018, and thereafter filed an objection and requested that the Court set a hearing and a deadline to file a motion to quash the prejudgment writs. (Filing No. 142). After a telephonic hearing with the Court, the parties met and conferred and agreed to dismiss the prejudgment writ as to the Edward Jones accounts. (Filing Nos. 150 and 151). Defendants have now moved to quash the remaining prejudgment writ to Waddell & Reed, the Court's sealed order for prejudgment writ, and the United States' application for prejudgment writ. (Filing No. 154).

Defendants objected to the prejudgment writ on several grounds. First, Defendants assert that the procedure utilized by the United States violated the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution and did not comply with the requirements set forth in 28 U.S.C. §§ 3301-3407. Next, Defendants assert that the United States improperly garnished funds in excess of the entire underlying judgment against Stabl, and also improperly

---

[4] Neb. Rev. Stat. §§ 36-701 to 36-712.

garnished funds on behalf of the State. Defendants further argue that the garnished funds are solely owned by parties other than Stabl, which is the only judgment debtor. Defendants additionally argue that the United States' *ex parte* actions were unconscionable and unnecessary because Defendants "have not acted intentionally to hinder, delay, or defraud the United States, and Defendants' actions have not had the effect of hindering, delaying, or defrauding the United States." (Filing No. 154). Finally, Defendants argue less restrictive alternative remedies are available. (Filing No. 155 at pp. 19-20).

## STATUTORY FRAMEWORK

The United States applied for the prejudgment writs of garnishment pursuant to 28 U.S.C. § 3101, which permits the United States to petition the court for a prejudgment remedy "at any time after the filing of a civil action on a claim for a debt[.]" 28 U.S.C. § 3101(a)(1). The United States' application must "set forth the factual and legal basis for each prejudgment remedy sought," "state that the debtor against whom the prejudgment remedy is sought shall be afforded an opportunity for a hearing," and "set forth with particularity that all statutory requirements under this chapter for the issuance of the prejudgment remedy sought have been satisfied." 28 U.S.C. § 3101(a)(2)-(3). The Court may grant a prejudgment remedy "if the United States shows reasonable cause to believe" that the debtor:

> (A) is about to leave the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States in its effort to recover a debt;
> (B) has or is about to assign, dispose, remove, conceal, ill treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States;
> (C) has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States; or
> (D) has evaded service of process by concealing himself or has temporarily withdrawn from the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States . . .

28 U.S.C. § 3101(b).

The United States' application for a prejudgment remedy under § 3101(a) must include "an affidavit establishing with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application." 28 U.S.C. § 3101(c)(1). The affidavit also must also specifically

4

state: the amount of the debt, including interest and costs, claimed by the United States; "one or more of the grounds specified in [§ 3101(b)];" and any statutory requirements particular to the specific remedy sought. 28 U.S.C. § 3101(c)(2). The United States is not required to post a bond. 28 U.S.C. § 3101(c)(3). Once the court determines "that the requirements of subsections (a), (b), and (c) have been met, the court shall issue all process sufficient to put into effect the prejudgment remedy sought." 28 U.S.C. § 3101(e).

The United States must notify the debtor of the right to request a hearing. 28 U.S.C. § 3101(d)(1). The debtor may move to quash the order granting a prejudgment remedy by requesting a hearing prior to judgment on the United States' claim for the debt. Issues at the hearing are limited to: (1) "the probable validity" of the United States' claim for the debt "and of any defense or claim of exemption asserted;" (2) the United States' compliance with statutory requirements for issuance of the prejudgment remedy; (3) "the existence of any ground set forth in [[§ 3101(b)]"; and (4) "inadequacy of alternative remedies (if any) to protect the interests of the United States." 28 U.S.C. § 3101(d)(2)(A)-(D).

At a post-deprivation hearing under § 3101(d)(2), the United States and the debtor "generally engage in a burden-shifting exercise where the debtor bears the initial burden of putting forward evidence that places the [United States'] showing of the probable validity of the debt in dispute." *United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 460, 465 (D.S.C. 2016), *appeal dismissed sub nom. United States ex rel. Lutz v. United States*, 853 F.3d 131 (4th Cir. 2017). The debtor is not required "to present affirmative evidence to successfully challenge the [United State's] showing," but instead may put the probably validity in dispute "through cross-examination of the affiant or other witnesses relied on by the [United States]." *United States. ex rel Doe v. DeGregorio*, 510 F. Supp. 2d 877, 885-86 (M.D. Fla. 2007)(citing *United States v. Teeven*, 862 F. Supp. 1200, 1218 n.24 (D. Del. 1992)). If, however, the United States' affidavit is "sufficiently particularized" and the affiant's "sources of information are shown to be reliable because they have personal knowledge of the events about which they provided information, [the debtor] must come forward with affirmative evidence to rebut the [United States's] showing." *Id.* at 886. "Nowhere in the text or the history of this statute is it suggested that this hearing [under § 3101(d)(2)] is intended to be a trial on the merits." *Teeven*, 862 F. Supp. at 1217 n.22. "The Court must only be satisfied of the probable validity of the claim of the debt," and, "[f]or purposes of this hearing, the Court need not exclude from its consideration any

evidence, whether admissible at trial or not, supporting or contradicting the probable validity of the debt." *Id.*

**ANALYSIS**

At the evidentiary hearing, Defendants challenged the prejudgment writ on each of the bases set forth in 28 U.S.C. § 3101(d)(2)(A)-(D). Although the Court finds that the Defendants did not meet their burden to rebut the United States' showing of the probable validity of its claim for debt or demonstration of the existence of at least one of the grounds set forth in § 3101(b), the Court finds that because Defendants have demonstrated that there is an adequate alternative remedy to protect the interests of the United States, and because more than the United States' claim for debt was garnished pursuant to the writ, the prejudgment writ should be quashed.

### A. Probable Validity of Claim for Debt

The evidence provided by the United States in both its *ex parte* affidavit application and at the post-deprivation hearing demonstrate the probable validity of the United States' claim of debt. The United States has proffered three separate theories that the wire transfers were fraudulent transfers under the FDCPA, although the probable validity of just one is sufficient for the United State to obtain a prejudgment remedy. The United States' third claim alleges that the July 13, 2010, wire transfers were fraudulent under 28 U.S.C. § 3304(b)(1)(B) because Stabl made such transfers "without receiving a reasonably equivalent value in exchange," at a time when Stabl "believed or reasonably should have believed that [it] would incur debts beyond its ability to pay as they became due." 28 U.S.C. § 3304(b)(1)(B). In evaluating probable validity, the "totality of the circumstances" are considered. *Teeven*, 862 F. Supp. at 1218 n. 24.

The evidence establishes that Mr. Johnson was the president of Stabl and sole shareholder of its holding company, Lant. On May 28, 2010, Mr. Johnson and six of his companies sold all of their assets to Darling International for $15.2 million. (TR. 39-40, 138; Ex. 111; Filing No. 131-2 at p. 31). At the time of the sale, the Asset Purchase Agreement for the May 2010 sale did not allocate the purchase price among the sellers at that time, but instead provided that, 90-days after closing, the purchaser was to prepare and deliver to the sellers a copy of Form 8594 at which point the allocation would be made. (Filing No. 131-2 at p. 32; TR. 140). That did not

happen within 90 days; instead, Mr. Johnson and his long-time accountant, Dale Thomas, CPA, developed their own allocation in approximately January 2011. (TR. 142).

Although the official allocation form was not prepared until January 2011, the sales proceeds were disbursed shortly after the May 2010 sale. After adjustments, the total sales proceeds received by the sellers was approximately $15.084 million, which was wired into a checking account held by Stabl in two separate wire transfers. (Filing No. 131-1 at p. 12; Filing No. 131-2 at pp. 105-108). Nearly $3.9 was immediately used to pay off debts owed by Mr. Johnson, Lant, and Lant's subsidiaries. (TR. 138). Thereafter, Stabl carried approximately $10 million as an asset labeled "Cash in Bank." Several months later, the $10 million was carried under "Officers Expenses Advance." (Filing No. 131-1 at pp. 8-9). Much of the net proceeds deposited in Stabl's checking account were used for payment of the Johnsons' personal expenditures, including purchasing a Cadillac, $1.225 million in gifts to the Johnsons' children, $485,000 to pay off personal loans owed by the Johnsons, $8 million wired to the Johnsons' investment accounts (the wire transfers at issue), and $700,000 to pay the Johnsons' personal state income taxes, among other items. (Filing No. 131-1 at p. 14; TR. 170).

Prior to the sale, as of March 31, 2010, Stabl's book value was between $6-$7 million, and financial statements from April 30, 2010, show Stabl's book value was approximately $7.4 million. (Filing No. 131-1 at pp. 6-7). However, the Defendants allocated to Stabl only $2.75 million of the total sale proceeds, although Stabl owed approximately $3.3 million in bank debt. (TR. 159-160). The Johnsons' other businesses with negative book values prior to the sale were given positive portions of the sale proceeds. For example, Tri-State By-Products had a total book value of approximately negative $2.9 million as of March 31, 2010, but was allocated proceeds of $244,000 from the sale. (Filing No. 131-1 at p. 8; Balance Sheet for Tri-State By-Products). The allocation provided Mr. Johnson personally with $10.852 million, $7 million of which Mr. Johnson attributes to his personal ownership of all of the companies' goodwill. The remaining $3.852 million was allocated toward the value of real property (land and buildings) transferred during the sale. (TR. 37-39).

The timing of the $8 million wire transfers lends credence to the United States' allegations of fraudulent transfers. On July 8, 2010, the United States sent Mr. Johnson's attorneys a letter offering to settle the CWA penalties for approximately $2.88 million. (Filing No. 131-2 at p. 28). Five days later, on July 13, 2010, approximately $8 million was wired to the

Johnsons' accounts at Waddell & Reed and Edward Jones.  (TR. 40).  Immediately after these wire transfers, Stabl had $1.88 million in its accounts, and by October 2011, the accounts were "drained."  (TR. 138).  The businesses ceased operating and Stabl was administratively dissolved in 2012 when it did not file an occupational tax return.  (TR. 139).  Essentially, these transfers left Stabl with potential debts greater than its assets at a time when the Johnsons knew of the ongoing CWA enforcement action and potential for penalties, and without receiving a reasonably equivalent value in exchange.  See 28 U.S.C. § 3304(b)(1)(B)("[A] transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation . . . without receiving a reasonably equivalent value in exchange" at a time when the debtor "believed or reasonably should have believed that [it] would incur debts beyond its ability to pay as they became due."); see also 28 U.S.C. § 3302(a)("[A] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at fair valuation.").  Considering the totality of the circumstances, the Court finds that the United States met its burden to establish the probable validity of the debt. See *Teeven*, 862 F. Supp. at 1218 n.24.

### B.  Compliance with Statutory Requirements for Issuance of Prejudgment Writ

Defendants challenge the United States' compliance with the requirements of 28 U.S.C. § 3101 in obtaining the prejudgment writ.  Defendants primarily argue that the United States wrongfully garnished the entire balance of both the Edward Jones and Wadell & Reed accounts, totaling over $4 million, which was more than the entire underlying judgment.  Defendants maintain that the United States could garnish, at a maximum, one-half of the $2,285,874 judgment awarded against Stabl in the underlying case.  (Filing No. 155 at p. 18).

Under 28 U.S.C. § 3104(a), "If the requirements of section 3101 are satisfied, a court may issue a writ of garnishment against property . . . in which the debtor has a substantial nonexempt interest and which is in the possession, custody, or control of a person other than the debtor in order to satisfy a claim for a debt."  28 U.S.C. § 3104(a).  "The value of property garnished shall not exceed the amount by which the sum of the amount of the debt claimed by the United States" including interest. 28 U.S.C. § 3104(c).

The United States' application sought only to garnish the Johnsons' investment accounts up to $2,298,779.02, which is the amount of the total amount of the underlying 2014 judgment plus interest.[5]  At the time the United States applied for the prejudgment writs, it did not know the amounts in the investment accounts, but explicitly stated that "if those holdings exceed $2,298,779.02, the excess holdings should not be garnished."  ([Filing No. 130 at p. 21]). However, regardless of whether the undersigned agrees with the United States that it could properly seek to garnish the entire amount of the underlying judgment (instead of only one-half, as argued by Defendants), there is no dispute that over $4.5 million of the Johnsons' funds were initially garnished pursuant to the prejudgment writs.  Although the parties' agreed to release the Edward Jones writ, Waddell & Reed continues to freeze the assets in the Johnson's investment account with a net asset value of $3,395,924.70, an amount well beyond the maximum amount of debt claimed by the United States, in contravention of the statute which provides that "[t]he value of property garnished shall not exceed the amount by which the sum of the amount of the debt claimed by the United States."  28 U.S.C. § 3104(c).  Waddell & Reed froze and continues to freeze the Johnsons' entire investment account, which contained a net asset value of $3,395,924.70 at the time of garnishment.  The remedy for this over-garnishment is not clear, as the United States ostensibly complied with the statutes when applying for the writs and stated that that holdings in excess of $2,298,779.02 should not be garnished; however, this discussion is largely academic because the Court will nevertheless order that the writ be quashed because an adequate alternative remedy to garnishment exists.

### C.  Grounds Set Forth in § 3101(b)

Defendants argue that the United States did not demonstrate the existence any statutory grounds set forth in § 3101(b) or any other exigent circumstances requiring the prejudgment writs to be issued.  In addition to the probable validity of the debt, the United States must show

---

[5] The United States calculated interest on the judgment by:

> . . . using the weekly average one-year constant maturity Treasury yield for the calendar week preceding the date of the judgment, as published in the Federal Reserve Bulletin, compounded annually. The Treasury yield for the week preceding the entry of the judgment on January 10, 2014 was 0.13 percent. This results in total interest calculated from January 10, 2014 through May 31, 2018 of $12,905.02.

([Filing No. 131-1 at p. 6] n.10).

reasonable cause to believe that one of the statutory grounds for issuance of a prejudgment remedy exists. See 28 U.S.C. § 3101(b).

In this case, the United States showed reasonable cause to believe that the debtors *had* or were "about to assign, dispose, remove, conceal, ill treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States." 28 U.S.C. § 3101(b)(1)(B). The United States applied for prejudgment remedy after learning that the Johnsons "removed millions of dollars out of the accounts" and were "continuing to withdraw substantial sums." (Filing No. 130 at p. 2). The United States demonstrated that, at least at the time it applied for the prejudgment writ, substantial sums of money—almost $4 million—had been withdrawn from the Johnsons' accounts over the previous years, including $930,000 from Waddell & Reed between September 2015 and September 2017. (Filing No. 131-1 at pp. 14-15). Based on account records obtained after the Court issued the prejudgment writ, the United States further stated it learned that the Johnsons had withdrawn "over $6.6 million from those accounts, including $3.046 million from Waddell & Reed in the past five years" up to May 2018, shortly before the writ was issued. (Filing No. 161 at pp. 11-12). Moreover, at the time the United States applied for the writs, it was unaware of other sources of funds available for the defendants to satisfy a judgment. Although Defendants argue the United States did not demonstrate they acted with any intent to hinder or defraud, the statute only requires that the transfers have the "*effect* of hindering, delaying, or defrauding the United States." 28 U.S.C. § 3101(b)(1)(B)(emphasis added); see Filing No. 154 at p. 3. The statute does not contain an intent requirement. See *Teeven*, 862 F. Supp. at 1214. Accordingly, at the time the writ was issued, the United States demonstrated reasonable cause to believe at least one statutory ground existed under § 3101(b).

### D. Constitutional Due Process

Defendants argue that the FDCPA violates their constitutional right to due process. The United States Supreme Court has stated that a statute permitting prejudgment attachment without a hearing and without a showing of exigent circumstances "clearly falls short of the demands of due process." *Connecticut v. Doehr*, 501 U.S. 1, 18 (1991). However, other courts that have concluded that that the constitutionally required compelling need and exigent circumstances existed when the United States establishes one of the 28 U.S.C. § 3101(b) statutory grounds. See *DeGregorio*, 510 F. Supp. 2d at 881; *Teeven*, 862 F. Supp. at 1224 n.42. The undersigned agrees

with these courts that due process is satisfied by the United States' showing grounds for issuance of prejudgment remedies pursuant to § 3101(b)(1)(B) combined with the opportunity for the debtor to request a § 3101(d)(2) post-deprivation hearing.

###    E.  Adequate Alternative Remedies

Finally, although the Court concludes that the United States initially met its burden to show prejudgment attachment was necessary based on the information known to it at the time of the application, the Court finds that Defendants have shown there are adequate alternative remedies to protect the United States' interests.  See 28 U.S.C. § 3101(d)(2)(D).  The purpose of a prejudgment remedy is to ensure that debtors cannot "wreak havoc to the Government's efforts to collect" on a probably valid debt.  See *Teeven*, 862 F. Supp. at 1226.  Certainly, at the time the United States sought the prejudgment remedy, the information and evidence known to the United States indicated that prejudgment garnishment would be necessary to prevent complete dissipation of assets to pay the judgment.  However, Defendants, both through their counsel and testimony adduced at the hearing, provided an adequate alternative to completely freezing their Waddell & Reed investment account.  Defendants have lived, worked, and owned property in Nebraska for the last 15-20 years, and although they purchased a condo in Zihuatanejo, Mexico in 2015, the vast majority of Defendants' property and assets are in Nebraska.  (TR. 52-53, 82).  Defendants provided evidence of their 2018 real estate holdings.  (Ex. 107; TR. 48-52).  Defendants have approximately $678,324 in assessed real property in Nebraska; $678,000 in liquid assets maintained in the Wells Fargo account constituting farm sale proceeds; $3,395,924.70 in the Waddell & Reed investment account; and $1.1 million in the Edward Jones investment accounts.  (Ex. 107; TR. 53).  Defendants have represented through their counsel that they are willing to submit to a Court order directing them to maintain liquid assets sufficient to protect the United States and requiring them to obtain a court order before making large withdrawals from such accounts.

Although Defendants suggest such court order should be limited to one-half of the underlying judgment, the Court concludes at this time that Defendants must maintain liquid assets in the full amount of $2,298,779.02 at all times until further order of the Court. Commencing on the day that the writ is dismissed and terminated, and every 30-days thereafter, Defendants must provide the court with a report constituting a statement of all their assets and

liabilities and income and expenses. Defendants also must obtain Court approval before making any withdrawals from the Waddell & Reed account. This remedy will alleviate the United States' concerns that there will be no money to pay a potential judgment at the conclusion of this lawsuit, but also will provide Defendants with the opportunity to manage their investments without a total freeze on their largest investment account. Therefore, because the United States' interests will be protected by this alternative remedy, the Court finds the prejudgment writ should be quashed pursuant to 28 U.S.C. § 3101(d)(2)(D). Upon consideration,

**IT IS ORDERED:**

1. Defendants' Motion to Quash (Filing No. 154 in the Lead Case) is granted;

2. The "Prejudgment Writ of Garnishment Waddell & Reed, Garnishee," issued pursuant to this Court's July 9, 2018 "Order For Prejudgment Writ" (Filing No. 136) is dismissed and terminated in its entirety; and the Plaintiff United States of America shall immediately notify Waddell & Reed of this Order; and

3. Defendants must maintain liquid assets in the amount of $2,298,779.02 at all times until further order of the Court. Commencing on the day that the writ is dismissed and terminated, and every 30-days thereafter, Defendants must provide the court with a report constituting a statement of all their assets and liabilities and income and expenses.[6] Defendants also must obtain Court approval before making any withdrawals from the Waddell & Reed account.

Dated this 19th day of November, 2018.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

---

[6] The report shall be filed in CM/ECF as a restricted document.