IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>STABL, INC., LANT, INC., LEON JOHNSON, and ANN JOHNSON,<br><br>    Defendants. | 8:16CV233 |
| STATE OF NEBRASKA,<br><br>    Plaintiff,<br><br>vs.<br><br>STABL, INC., LANT, INC., LEON JOHNSON, and ANN JOHNSON,<br><br>    Defendants. | 8:16CV351<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on several motions. For the reasons discussed below, Defendants' Motion for Summary Judgment against the State of Nebraska, Member Case ECF No. 216,[1] will be granted. The State's Motion for Partial Summary Judgment, ECF No. 221, will be denied. Defendants' Statement of Objections to Magistrate Judge's Order, ECF No. 263, will be overruled as moot. The United States' Joint Motion for Summary Judgment, ECF No. 225, will be granted in part; and

---

[1] This case was originally filed by the United States at 8:16CV233 (Lead Case). The State then filed its case at 8:16CV351 (Member Case). The Lead Case and Member Case are referred to jointly as the enforcement actions. The cases were consolidated for purposes of pretrial management. All references to the docket will be to the Lead Case unless otherwise specified.

Defendants' Motion for Summary Judgment against the United States, ECF No. 229, will be granted in part.

## FACTUAL BACKGROUND

In compliance with the Court's local rules, the parties submitted numbered statements of facts and corresponding responses. Unless otherwise indicated, the following facts are undisputed for purposes of the pending Motions for Summary Judgment.

Defendant Stabl, Inc. (Stabl)[2] was a Nebraska corporation. Defendant Lant, Inc. (Lant) was also a Nebraska corporation and was the sole owner of Stabl.[3] Lant owned several other companies: Tri-State By-Products, Inc. (Tri-State); Dodge City Services, Inc. (Dodge City); and Great Plains Sales, Inc. (Great Plains). Defendant Leon Johnson was the sole owner of Lant and the president of Lant and Stabl. Leon Johnson also owned Plum Creek Transport, Inc. (Plum Creek). Defendant Ann Johnson is married to Leon Johnson and was an employee of Stabl and Lant.

From October 1995 until May 28, 2010, Stabl operated a rendering facility in Lexington, Nebraska. In the course of its operations, Stabl violated the Clean Water Act (CWA), 33 U.S.C. §§ 1251–1388 and the Nebraska Environmental Protection Act (NEPA), Neb. Rev. Stat. §§ 81-1501 to 81-1532. The United States Environmental Protection Agency (EPA) and Nebraska Department of Environmental Quality (NDEQ) brought enforcement actions against Stabl, and this Court entered judgment for the

---

[2] Stabl was incorporated as Nebraska By-Products, Inc. on March 23, 1979. Its name was changed to Stabl, Inc. on June 3, 2010.
[3] Stabl and Lant were administratively dissolved by the Nebraska Secretary of State due to nonpayment of taxes on April 16, 2012.

2

plaintiffs in the amount of $2,285,874 to be divided equally between the plaintiffs. *United States v. Stabl, Inc.*, No. 8:11CV274, 2014 WL 12576928 (D. Neb. Jan. 10, 2014).

On May 28, 2010, Darling International, Inc. (Darling), purchased assets from Stabl, Lant, Tri-State, Dodge City, Great Plains, Plum Creek, and Leon Johnson for $15,200,000. The sale included virtually all Stabl's assets. The funds were deposited into an account at Platte Valley State Bank and Trust Company (Platte Valley) under the name of Nebraska By-Products. Leon and Ann Johnson were signatories to the account. The same day, approximately $3.84 million was deducted from the account to pay off Stabl's bank loans.

On July 13, 2010, three wire transfers caused a withdrawal of funds from the Platte Valley account, totaling $8 million. Two transfers were for "$2 million to Waddell and Reed, received by UMB Bank of Kansas City, Missouri, listing the originator as 'Nebraska By-Products, Inc.' and the originator to beneficiary information as: 'Leon A. Johnson and Ann M. Johnson . . . .'" Pls. Br. ¶ 33, ECF No 226. The third transfer was for "$4 million to Edward Jones, received by the Northern Trust Company of Chicago, Illinois, listing the originator as 'Nebraska By-Products, Inc.' and the originator to beneficiary information as 'Leon and Ann Johnson . . . .'" *Id.* On July 14, 2010, there was $1.437 million remaining in the Platte Valley account, and Stabl had $665,000 across other accounts. The Platte Valley account was emptied and closed by October 3, 2011. Plaintiffs' expert witnesses claim the Johnsons received $10,853,589 from the sale. ECF No. 236-8 19.

Lant's own tax documents and those of its subsidiaries for November 2009 through October 2010 included Form 8594, entitled "Asset Acquisition Statement." This document

allocated the sale proceeds of the May 28, 2010, sale. Form 8594 was not produced in discovery in these enforcement actions.

In February of 2016, Stabl's counsel sent a letter to Plaintiffs stating that after the sale, Stabl's liabilities exceeded its assets by $3,956,225. On June 6, 2018, Leon Johnson testified in a deposition that sometime near the asset sale Stabl became insolvent.

On May 26, 2016, the United States brought an action to collect on its judgment under the Federal Debt Collection Procedures Act (FDCPA), 28 U.S.C. §§ 3001–3308. ECF No. 47. On July 15, 2016, the State of Nebraska brought a similar action to collect under Federal Rule of Civil Procedure 69 and the Nebraska Uniform Fraudulent Transfer Act (NUFTA), Neb. Rev. Stat. §§ 36-701 through 36-712, *repealed by* 2019 Neb. Laws 70, § 20 (repeal effective Sept. 1, 2019). Member Case ECF No. 15. The cases were consolidated for purposes of discovery and pretrial management on February 28, 2017. ECF No. 37. On March 22, 2019, The State filed a Motion for Partial Summary Judgment, ECF No. 221, both Plaintiffs filed a Joint Motion for Summary Judgment, ECF No. 225, and Defendants filed a Motion for Summary Judgment against both Plaintiffs, ECF No. 229.

**STANDARD OF REVIEW**

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "Summary judgment is not disfavored and is designed for every action." *Briscoe v. Cty.*

4

*of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving party need not produce evidence showing "the absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 325). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042).

"[T]here must be more than the mere existence of some alleged factual dispute" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Wagner*, 788 F.3d at 882 (quoting *Torgerson*, 643 F.3d at 1042). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue of material fact" for trial and summary judgment is appropriate. *Whitney*, 826 F.3d at 1076 (quoting *Grage v. N. States Power Co.-Minn.*, 813 F.3d 1051, 1052 (8th Cir. 2015)).

## DISCUSSION

The State seeks partial summary judgment dismissing Defendants' third affirmative defense, which states that Nebraska filed its complaint out of time due to the statute of limitations in the NUFTA. Plaintiffs jointly move for summary judgment on the merits. Defendants move for summary judgment dismissing both cases.[4]

### I. NUFTA Statute of Limitations

The State moves for partial summary judgment dismissing Defendants' third affirmative defense, which asserts that the NUFTA statute of limitations bars the State of Nebraska's action. ECF No. 221. Defendants move for summary judgment dismissing

---

[4] Defendants also brought objections to the Magistrate Judge's denial of their motion to compel. ECF No. 263. The motion to compel only sought information from the State; therefore, the objections are overruled as moot.

the State's action under the NUFTA as time-barred by the statute of limitations. Member Case ECF No. 216.

An action under section 36-705(a)(1) of the NUFTA must be brought "within four years after the transfer was made . . . or, if later, within one year after the transfer . . . was or could reasonably have been discovered by the claimant . . . ." Neb. Rev. Stat. § 36-710. The State filed its original complaint on July 15, 2016, more than six years after the July 13, 2010, wire transfers. For the State to show that its action was timely, it must show that it was brought within the discovery rule of the statute. In other words, it must show that it could not reasonably have discovered the transfers or their fraudulent nature before July 15, 2015—one year prior to the date of the State's Complaint.

The State argues that this case is analogous to *Indiana Bell Telephone Co. v. Lovelady*, No. SA-05-CA-285-H, 2008 WL 11408781 (W.D. Tex. Mar. 5, 2008). In *Indiana Bell*, the court held that the defendants did not meet their burden to prove the affirmative defense of the statute of limitations in their motion for summary judgment.[5] *Id.* at *2, *4. The court determined that the defendants did not show, as a matter of law, that the plaintiff could reasonably have found the transfers more than one year before they brought their claims against the defendants. The plaintiff learned of two of the three transfers from discovery in the underlying litigation and learned of the third transfer in post-judgment discovery within three months of receiving its judgment.[6] The plaintiff brought its suit

---

[5] The court did conclude that one of the plaintiff's claims was barred by the statute of limitations because the plaintiffs knew of the transfer for more than a year prior to bringing the cause of action. *Ind. Bell*, 2008 WL 11408781, at *4 ("[T]he Plaintiff discovered the 2001 distribution on August 10, 2004; therefore, it had to bring its actual fraud claim concerning this transfer by August 10, 2005.").

[6] The date of discovery in *Indiana Bell* is unclear. The court says that the plaintiff attempted to learn of the transfers in a deposition of one of the defendants on August 10, 2004, but defendants' counsel "instructed [the defendant] not to answer and refused to allow [the defendant] to divulge such information." *Id.* at *2. But later in that paragraph, without reference to any other events occurring on that date, the court says that "Plaintiff discovered the 2001 and 2003 transfers on August 10, 2004 . . . ." *Id.* Similarly, the court stated

7

against the first group of defendants within a month of receiving the post-judgment discovery.

The statute of limitations under the Texas Uniform Fraudulent Transfer Act (TUFTA), Tex. Bus. & Com. Code §§ 24.001–24.013, is nearly identical to that in the NUFTA. *Compare* Tex. Bus. & Com. Code § 24.010, *with* Neb. Rev. Stat. § 36-710. Also, both statutes instruct courts to use "the principles of law and equity, including . . . the law relating to . . . fraud" to supplement interpretation of the statutes. Tex. Bus. & Com. Code § 24.011; Neb. Rev. Stat. § 36-711.

In Nebraska, "[a]n action for fraud does not accrue until there has been a discovery of the facts constituting the fraud, or facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to such discovery." *Chafin v. Wis. Province of Soc'y of Jesus*, 917 N.W.2d 821, 824 (Neb. 2018) (citing *Fitzgerald v. Cmty. Redevelopment Corp.*, 811 N.W.2d 178 (Neb. 2012)). However, this does not require "that a plaintiff have knowledge of the exact nature or source of a problem, but only that a problem exists." *Kalkowski v. Neb. Nat'l Trails Museum Found., Inc.*, 826 N.W.2d 589, 597 (Neb. Ct. App. 2013) (citing *Nuss v. Alexander*, 691 N.W.2d 94 (Neb. 2005)). In other words, "[d]iscovery, as applied to the statute of limitations, occurs when one knows of the existence of an inquiry or damage and not when he or she has a legal right to seek redress in court." *Chafin*, 917 N.W.2d at 824 (citing *Andres v. McNeil Co.*, 707 N.W.2d 777 (Neb. 2005); *Kalkowski*, 826 N.W.2d 589).

---

that in May of 2005, "in response to post-judgment discovery requests, [the defendant] sent Bell documents indicating that the 2000 transfer had occurred. Even then, [the defendant] only produced documents concerning financial transactions occurring January 1, 2001 or later . . . ." *Id.* Again, though, the court determined that "[the plaintiff] discovered the 2000 transfer on May 13, 2005." *Id.*

8

The plaintiff in *Indiana Bell* sued at least one group of defendants within the four-year statute of limitations for two of the transfers and conducted post-judgment discovery within three months of receiving its judgment for the sole purpose of investigating the defendants' ability to pay. Here, the State learned on December 3, 2012, in response to discovery in the underlying action, that Stabl had sold virtually all its assets in 2010 as part of a $15.2-million sale. Pl.'s Br ¶ 24, ECF No. 222. That same day, the State learned that Stabl had negative retained earnings of $3,956,225 at the end of the 2010 tax year. *Id.* The State received its judgment against Stabl on January 10, 2014. At that point, a reasonable litigant in the State's position—with a $1 million judgment against a dissolved corporate defendant whose retained earnings were negative almost $4 million the same year it sold nearly all its assets—would engage in post-judgment discovery to ensure it could recover on its judgment.

The State argues that it was reasonable not to engage in post-judgment discovery because Stabl sought to appeal the judgment. Stabl filed its notice of appeal in the underlying case on May 2, 2014, and the Eighth Circuit rendered its judgment on August 27, 2015, and issued its mandate on October 21, 2015. That appeal did not prevent the State from conducting post-judgment discovery or seeking to enforce its judgment.[7] This Court denied Stabl's motion to stay, 8:11cv267, ECF No. 163, and it does not appear that Stabl filed a motion to stay with the Eighth Circuit. Stabl also did not post a bond pursuant to Federal Rule of Civil Procedure 62 or Federal Rule of Appellate Procedure 8. The

---

[7] *See Nat'l Serv. Indus. v. Vafla Corp.*, 694 F.2d 246, 250 (11th Cir. 1982) ("Defendants did not post a supersedeas bond or obtain a stay of the judgment pending appeal. Therefore, plaintiff may treat the judgment as final and execute upon it. If a judgment may be executed upon after an appeal has been filed, certainly discovery in aid of its execution is not precluded by the filing of an appeal.") (citations omitted).

9

State could have and should have discovered the transfers and their fraudulent nature before July 15, 2015. The State's complaint was, therefore, not timely under the NUFTA statute of limitations and is dismissed.

## II. Affirmative Defenses

In their Answer, ECF No. 71, Defendants assert ten affirmative defenses. The Court has already granted the United States' Motion to Strike the third affirmative defense of statute of limitations. *United States v. Stabl, Inc.*, No. 8:16CV233, 2018 WL 3758204 (D. Neb. Aug. 8, 2018) (Nelson, Mag. J.). Defendants' fourth, sixth, seventh, eighth, and tenth purported affirmative defenses are not affirmative defenses, but are defenses to the elements the United States must prove and accordingly are discussed where they are relevant to those claims.[8] The remaining affirmative defenses are discussed below.[9]

Defendants' purported waiver and estoppel defenses appear to be based on the same argument. Defendants cite no support for either defense—other than to say that they are valid defenses against the government. Both defenses fail as a matter of law.

"[A] right . . . is waived when it is 'intentionally relinquished or abandoned.'" *United States v. Demilia*, 771 F.3d 1051, 1055 (8th Cir. 2014) (quoting *United States v. McCoy*, 496 F.3d 853, 856 (8th Cir. 2007). Estoppel occurs where "a person is held to a

---

[8] An affirmative defense is an "assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." *Defense*, Black's Law Dictionary (11th ed. 2019).
[9] The fifth and ninth affirmative defenses of unclean hands also fail as a matter of law because the United States seeks legal damages, not equitable remedies, and unclean hands is a defense to the latter. *Cf. Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 ("The guiding doctrine in this case is the equitable maxim that 'he who comes into equity must come with clean hands.' . . . That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith."); *Olsen v. Olsen*, 657 N.W.2d 1, 10 (Neb. 2003) ("Under the doctrine of unclean hands, a person who comes into a court of equity to obtain relief cannot do so if he or she has acted inequitably, unfairly, or dishonestly as to the controversy at issue.") (citing *Manker v. Manker*, 644 N.W.2d 522 (Neb. 2002)).

representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has, in good faith, relied thereon." *Roll v. Martin*, 82 N.W.2d 34, 38 (Neb. 1957) (quoting *May v. City of Kearney*, 17 N.W.2d 448, 458 (Neb. 1945).

Defendants' argument appears to be that the United States intentionally relinquished its right to a fine under the CWA, because it consented to the sale of Stabl's assets and encouraged the construction of a water treatment plant which could prevent future violations of the CWA. Answer ¶ 89, ECF No. 71. Defendants argue that because the United States knew of the sale and did not investigate or object to the transaction at that time or bring the Johnsons into the initial action as defendants, the United States waived its claims or is estopped from bringing them. Defs.' Br. 48, ECF No. 241.

The United States did not waive any rights in this case. That the United States allowed the sale to proceed without objection because it knew of the plan to correct the violations does not evince any intention to waive its rights to a fine under the CWA. The United States was not a party to the sale agreement and none of its actions waived its CWA claims. The Johnsons were not defendants in the underlying litigation because it was the corporate entity, Stabl, that was in violation of the CWA. Thus, the waiver defense fails as a matter of law.

Defendants do not explain upon what actions they relied nor cite to any facts explaining how that reliance was to their detriment. They do not explain what inequitable results would occur if the United States is permitted to continue with its claim. Therefore, the defense of estoppel also fails as a matter of law.

### III. Federal Debt Collection Procedures Act

The United States seeks to collect from Defendants under the FDCPA. The FDCPA "provides the exclusive civil procedures for the United States to recover a judgment on a debt . . . ." 28 U.S.C. § 3001(a). Under the FDCPA, the United States "may obtain (1) avoidance of the transfer or obligation to the extent necessary to satisfy the debt to the United States; (2) a remedy . . . against the asset transferred or other property of the transferee; or (3) any other relief the circumstances may require." § 3306(a). There are three FDCPA provisions that the United States asserts that it can recover under: 28 U.S.C. § 3304(a)(1), (b)(1)(A), and (b)(1)(B).

*A. 28 U.S.C. § 3304(a)(1)*

In order for the United States to recover under 28 U.S.C. § 3304(a)(1), it must show (1) that Stabl incurred its debt to the United States before the transfers were made; (2) "the transfers were made without receiving a reasonably equivalent value in exchange for the transfers; and (3) [Stabl was] insolvent at that time or . . . [became] insolvent as a result of the transfer[s] . . . ." *Id.*

1. Whether the Withdrawals Were Transfers Under 28 U.S.C. § 3301(6)[10]

It is fundamental to every provision of the FDCPA upon which the United States relies that there were transfers from Stabl to the Johnsons as defined by the FDCPA. The FDCPA defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money . . . ." § 3301(6). Defendants argue that ownership of the account "has no bearing on the nature of the funds at issue . . . ." Defs.' Br. 32, ECF No. 231. Defendants further argue that Leon Johnson was the owner of the funds that

---

[10] This subsection is incorrectly numbered and is the eighth subsection of 28 U.S.C. § 3301.

were later withdrawn; that the funds were placed in a Stabl account for convenience only; and that Stabl never had an interest in the funds that were then passed along to their rightful owners—the Johnsons.

Even assuming Leon Johnson owned the real estate and goodwill, the funds were still transferred for purposes of the FDCPA. Illustrative of the issue here is the Eighth Circuit's discussion of a similar situation regarding bankruptcy law in *In re Rine & Rine Auctioneers, Inc.*, 74 F.3d 854 (8th Cir. 1996). In *Rine*, the debtor (Rine) was a business that auctioned personal property for its customers. Rine agreed to conduct a sale of assets for a corporate client (Huddle). Rine would collect the sale proceeds, subtract its fees, and distribute the remainder to Huddle's creditor (Bank). Rine conducted the sale and deposited all the proceeds into its general bank account. Then, Rine issued a check to Huddle for the amount payable to the Bank, and Huddle endorsed the check and deposited it with the Bank as payment for Huddle's debts. Shortly thereafter, Rine filed for bankruptcy. The Trustee filed against the Bank and Huddle, claiming that the transfer from Rine to Huddle was an avoidable preferential transfer.

The Trustee's claims turned on whether the funds belonged to Rine or Huddle. If Rine had an interest in the funds, the transfer was avoidable. The Eighth Circuit discussed two possible relationships between the holder of funds owned by one party and the party to whom the funds belong: agent/principle or debtor/creditor. *Id.* at 860–62. In the agent/principle relationship, the agent does not have an interest in the funds. *Id.* at 861 (quoting *In re Bellanca Aircraft Corp.*, 96 B.R. 913, 915 (Bankr. D. Minn. 1989)). In the debtor/creditor relationship, however, the debtor has an interest in the funds and owes the funds to the creditor. *Id.* at 861–62 (quoting *Bellanca*, 96 B.R. at 915). The

13

most important distinction between the two relationships is how the holding party uses the funds. If the funds are explicitly and intentionally segregated and the only time they are drawn upon is to deposit them with their original owner, the relationship is likely agent/principal. *Id.* at 862 n.6 (distinguishing two New York cases finding an agent/principal relationship between an auctioneer and its customers: one in which the funds were actually segregated and returned to the principal in the original form of cash and checks received by the bidders, *In re Martin Fein & Co.* (*Fein I*), 34 B.R. 333 (Bankr. S.D.N.Y. 1983); and one in which the funds were comingled in the auctioneer's general corporate account in violation of the constructive trust imposed on the funds under New York law, *In re Martin Fein & Co.* (*Fein II*), 43 B.R. 623 (Bankr. S.D.N.Y. 1984)); *see also Gutierrez v. Bowen*, 898 F.2d 307, 311–12 (2d Cir. 1990) (holding that funds held by a supplemental security income claimant who kept them in a separate account for a relative and never used the funds personally should not be calculated as part of the claimant's resources).

Here, Stabl did not segregate the funds that were purportedly owed to the Johnsons. There were funds in the account prior to the deposit of the sale proceeds, and Stabl used the same account to make other transactions, such as a $3.84 million deduction to pay off bank loans. Even if the Johnsons were the rightful owner of the money held in the Stabl account, the relationship was that of debtor/creditor. Therefore, Stabl had some interest in the funds and the transfers to the Johnsons were transfers as defined by 28 U.S.C. § 3301(6).

### 2. Whether Stabl's Debts to the United States Arose Prior to the Transfers

Stabl's debts to the United States arose at the times Stabl violated the CWA. Funds the United States is claiming could have "presumably be[en] awarded at the moment of [Stabl's] alleged wrongdoing, even if 'actual damages' did not accrue at that time." *McDonough v. Anoka Cty.*, 799 F.3d 931, 942 (8th Cir. 2015). Therefore, Stabl owed the United States a debt each time it violated the CWA. *See In re Knight*, 55 F.3d 231, 236 (7th Cir. 1995) (rejecting the argument that "a debt becomes noncontingent only when a triggering event (such as the entry of final judgment) occurs to make the claim immediately due" because the "legal duty to pay and the amount of payment due were established by statute, and were easily calculable."). All of Stabl's violations of the CWA took place prior to the asset sale, and thus, Stabl incurred "a debt to the United States which [arose] before the transfer[s were] made . . . ." 28 U.S.C. § 3304(a).

### 3. Whether the Transfers Were for Reasonably Equivalent Value

Under the FDCPA, "[v]alue is given for a transfer or obligation if, in exchange for the transfer or obligation . . . an antecedent debt is secured or satisfied." 28 U.S.C. § 3303(a). If the Johnsons owned the funds that were later withdrawn, the relationship between Stabl and the Johnsons was that of debtor and creditor. Defendants claim that Leon Johnson owned $10,852,000 of the funds in Stabl's account, therefore the transfers were for reasonably equivalent value—the repayment of a debt.

Prior to the sale, Darling hired the firm Houlihan Lokey (Houlihan) to conduct an appraisal of the assets Darling was going to purchase. Houlihan valued the companies and their assets as follows:

|  | Tangible Assets | Intangible Assets | Total Value |
|---|---|---|---|
| Stabl | $5,913,950 | $3,100,356 | $9,014,306 |

|            | (Property)   | (Intangibles) | (Total)     |
|------------|--------------|---------------|-------------|
| Tri-State  | $695,010     | $176,710      | $871,720    |
| Plum Creek | $816,893     | $164,418      | $981,311    |
| Great Plains | $0         | $35,826       | $35,826     |
| Dodge City | $1,630,168   | $792,362      | $2,422,530  |
| Leon Johnson | $1,522,935 | $351,925      | $1,874,860  |

In Darling's annual report for the 2010 fiscal year, Darling reported that the asset purchase consisted of property, plant, and equipment of $9,600,000; intangible assets valued at $2,800,000; and goodwill valued at $2,800,000. These numbers roughly correspond to the valuation performed by Houlihan.

Defendants, however, allocated the purchase as follows:

|              | Property and Equipment | Goodwill and Other Intangibles | Total Value  |
|--------------|------------------------|--------------------------------|--------------|
| Stabl        | $2,750,000             | $0                             | $2,750,000   |
| Tri-State    | $244,000               | $0                             | $244,000     |
| Plum Creek   | $750,000               | $0                             | $750,000     |
| Great Plains | $144,000               | $0                             | $144,000     |
| Dodge City   | $460,000               | $0                             | $460,000     |
| Leon Johnson | $3,852,000             | $7,000,000                     | $10,852,000  |

It is common practice "for the buyer and seller in an asset sale to use the same values in their respective forms, but it is not strictly necessary to do so." ECF No. 236-8 10. Defendants valued the companies and allocated the proceeds independently of Houlihan and Darling. *See* Defs.' Br. ¶¶ 25–35, ECF No. 241. Because of the conflicting financial information, the Court cannot, at this time, determine as a matter of law that Stabl transferred the funds without receiving reasonably equivalent value.

16

### 4. Whether Stabl Was Insolvent at the Time of the Transfers or Became Insolvent as a Result of the Transfers

Under the FDCPA, "a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 28 U.S.C. § 3302(a). Stabl was insolvent at the time of the wire transfers according to Stabl's counsel. Pls.' Ex. 34 2, 5, ECF No. 227-34 ("[A]s of the date of sale, Stabl's Bank debt far exceeded its assets."). Leon Johnson also stated the following in a deposition:

Q: When did Stabl become unable to pay a judgment?

A: I don't recall. It would have been -- I don't recall.

Q: Would it have been near the time of the sale?

A: Yes.

Q: So sometime near the time of the sale Stabl became unable to pay a judgment?

A: Insolvent.

L. Johnson Dep. 45:2-45:11, ECF No. 227-2. Also, Lant's tax returns for fiscal year 2010 showed that Stabl had negative retained earnings of $3,956,225. Therefore, Stabl was either insolvent at the time of the transfers or became insolvent as a result.

### B. 28 U.S.C. § 3304(b)(1)(A)

For the United States to recover under 28 U.S.C. § 3304(b)(1)(A) it must show that the transfers were made "with actual intent to hinder, delay, or defraud [the United States] . . . ." *Id.* The statute contains a non-exhaustive list of examples to consider when determining actual intent under § 3304(b)(1)(A). 28 U.S.C. § 3304(b)(2). Several of these may be applicable here:

(A) the transfer or obligation was to an insider;
   \*\*\*

17

(D) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(E) the transfer was of substantially all the debtor's assets;

\*\*\*

(I) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

*Id.* The United States alleges that the allocation was developed by Defendants after the Johnsons had withdrawn the money from the account. Defendants allocated to Leon Johnson $10.852 million. According to the United States' expert, the Johnsons received $10.853 million from the sale—almost exactly the amount allocated by Defendants. If these allocations were developed after the fact, that could be evidence of actual intent to hinder, delay, or defraud the United States.

Defendants claim that they relied on the opinions of experts—their accountants and attorneys—thus they could not have actual intent to defraud the United States. Also, if Stabl was actually paying off a debt to the Johnsons, that could rebut the claim of actual intent. Thus, the Court cannot, at this time, determine as a matter of law that Stabl transferred the money with the actual intent to hinder, delay, or defraud the United States under § 3304(b)(1)(A).

### *C. 28 U.S.C. § 3304(b)(1)(B)*

For the United States to recover under 28 U.S.C. § 3304(b)(1)(B) it must show that the transfers were made without receiving reasonably equivalent value in exchange and that Stabl "intended to incur, or believed or reasonably should have believed that [it] would incur, debts beyond [its] ability to pay as they became due." *Id.* For the reasons discussed above, the Court cannot, at this time, determine that the transfers were made without receiving reasonably equivalent value.

The EPA sent Stabl a letter in June of 2010 informing Stabl that the EPA had identified hundreds of violations and that Stabl was facing civil penalties as a result. Stabl knew that it was facing enforcement action by the United States and that if it lost, it would face a large fine. Therefore, Stabl believed or reasonably should have believed that it would incur debts beyond its ability to pay.

IV. **Piercing the Corporate Veil**

The FDCPA provides "the exclusive civil procedures for the United States to recover a judgment on a debt . . . ." 28 U.S.C. § 3001(a). The FDCPA also "preempt[s] State law." § 3003(d). The exceptions to the exclusivity of the FDCPA are explicitly set out by the statute. Section 3001(b) states that "[t]o the extent that another Federal law specifies procedures for recovering on a claim or a judgment for a debt arising under such law, those procedures shall apply to such claim or judgment to the extent those procedures are inconsistent with this chapter." Additionally, § 3003 lists the FDCPA's effects on the rights of the United States and the effects on other laws, specifically stating that the FDCPA does not prevent the United States from asserting certain common law claims. If Congress wished for the United States to have the ability to assert common law piercing-the-corporate-veil claims to collect a debt on a judgment, it would have done so. Therefore, the United States' claim for damages under a theory of piercing the corporate veil is dismissed.

Accordingly,

IT IS ORDERED:

1. The State of Nebraska's Complaint is dismissed, with prejudice;

2. Defendants' Statement of Objections to Magistrate Judge's Order is overruled as moot;

3. Defendants' affirmative defenses of waiver, estoppel, and unclean hands, are dismissed, with prejudice;

4. Count Four of the United States' Complaint is dismissed, with prejudice;

5. The remainder of Plaintiffs' Joint Motion for Summary Judgment is denied; and

6. The remainder of Defendants' Motion for Summary Judgment is denied.

Dated this 30th day of September 2019.

BY THE COURT:

s/Laurie Smith Camp
Senior United States District Judge